Ned A. GRIFFITH, Appellant,

v.

Warren A. TAYLOR, II, Attorney At Law, and Aglietti, Rodey & Offret, A Partnership, Appellees.

No. S–8970.

Supreme Court of Alaska.

Nov. 17, 2000.

---

**13.** *See Bennett,* 975 P.2d at 694.

**14.** AS 09.55.536(e).

Andrew K. Kurzmann, Anchorage, for Appellant.

Robert J. Dickson, Atkinson, Conway & Gagnon, Anchorage, for Appellees.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

### I. INTRODUCTION

Ned Griffith appeals a jury verdict that the legal malpractice of the predecessor law firm of Aglietti, Rodey & Offret was not the legal cause of his alleged damages.[1] Griffith argues that the superior court erred in precluding his experts from making use of certain deposition testimony, in instructing the jury on superseding causation, and in its handling of a jury poll. Because Griffith's arguments lack merit, we affirm the superior court in all respects.

### II. FACTS AND PROCEEDINGS

#### A. Facts[2]

Joe Griffith owned real property in Fairbanks. His son Ned Griffith assisted him in building a multi-family dwelling on the property. Ned paid for the materials, paid the laborers who worked on the building, and performed some of the labor himself.

---

1. Warren A. Taylor II, an attorney at Aglietti, Rodey & Offret, is also a defendant in this lawsuit. For the sake of simplicity, both Taylor and the firm will be referred to collectively as "the firm."

2. The statements of fact in this section are drawn from *Griffith v. Taylor (Griffith I )*, 937 P.2d 297 (Alaska 1997).

In April 1984 Ned expressed concerns to Joe about Joe's indebtedness to him. Ned was reluctant to continue working on the building because he was concerned that Joe could not compensate him for the substantial time, money, and effort he had expended.

In order to satisfy his past debts and provide compensation for Ned's labor, Joe agreed to transfer the property to Ned through a quitclaim deed. Jill Dean, an associate of Aglietti, Pennington & Rodey,[3] prepared the deed.[4] Joe signed the deed later in April. During that same month, Ned gave Joe a general power of attorney. Ned stated that he did so to enable Joe to purchase real property for Ned in California.

In 1985 Joe spoke with attorney Warren Taylor, who had joined the firm earlier that year. Joe told Taylor that he had transferred the Fairbanks property to Ned as security, that he had satisfied his debt to Ned, and that he wanted to use the power of attorney to transfer the property back to himself. Taylor prepared a quitclaim deed, which Joe signed pursuant to the power of attorney granted to him by Ned. The signature line on the deed reflected that it was signed by Joe through the power of attorney granted to him by Ned. The firm recorded the deed.

In 1987 Joe was told that the 1985 deed might be invalid because he had used the power of attorney to transfer the property to himself. Joe then asked Taylor to prepare another deed on which he could obtain Ned's signature. Taylor followed the statutory form and created a deed for Joe. Taylor gave the deed to Joe before it was signed and took no part in its subsequent execution. At some point, the deed was executed. However, it was later determined that Ned's signature had been forged. The firm did not assist Joe in recording the deed. Joe subsequently died.

In 1988 Ned learned of the 1987 deed when he attempted to sell the property.

### B. Proceedings

#### 1. Collateral proceedings

Ned originally sued to quiet title in the property. In that action, *Griffith v. Griffith*,[5] the jury found that the 1985 and 1987 deeds were invalid and that the property belonged to Ned.[6]

#### 2. These proceedings

##### a. The original superior court proceedings

Ned then filed the action that is before us today, alleging professional malpractice, breach of fiduciary duty, and breach of contract against the firm. Ned claimed that the firm "had engaged in a conflict of interest by participating both in the transfer of the property to Ned and in the 1985 and 1987 transfers which attempted to divest him of title to the property."[7] Ned also claimed that the firm had breached its fiduciary duty to him by failing to notify him of Joe's efforts to transfer the title of the property to himself.

Ned asserted that as a result of the firm's conduct, "he incurred $140,000 in attorney's fees and costs to litigate the quiet title action and suffered a diminution in the value of the property because of changes in the real estate market during the period of the litigation."[8]

The superior court granted summary judgment to the firm and dismissed all causes of action against both it and Taylor.

##### b. Our original decision

In Ned's first appeal, we reversed the superior court's grant of summary judgment to the firm[9] and remanded the case for further proceedings on whether the scrivener's exception applied to the firm's conduct.[10]

---

3. Aglietti, Rodey & Offret is the successor partnership to Aglietti, Pennington & Rodey.

4. See *Griffith I*, 937 P.2d at 299.

5. No. 4FA–89–775 Ci. (Alaska Super., May 18, 1992).

6. See *Griffith I*, 937 P.2d at 300 (citing *Griffith*, No. 4FA–89–775 Ci., at 4–5).

7. *Id.*

8. *Id.*

9. See *id.* at 309.

10. See *id.* at 306.

We instructed the superior court to consider the other elements of Ned's claim if it was determined on remand that the scrivener's exception did not apply.[11] We also reversed the superior court's grant of summary judgment to Taylor,[12] holding that an agent can be liable in tort, even if the agent "acted at the command of the principal."[13] We further stated that it is irrelevant whether Taylor joined the firm after its duty to Ned arose.[14]

### c. The proceedings on remand

### i. The preclusion of certain expert testimony

On remand, Ned sought to have his expert witnesses make use of deposition testimony given by Ronald A. Offret in early 1998. Offret, who oversaw the firm's office administration during the time when the firm prepared Joe's quitclaim deeds, stated that the firm's office policies prohibited unsigned documents from leaving the firm's office.

Ned argued that Offret's testimony revealed "that the Firm, through its agents, failed to adhere to its own in-house procedures." He further claimed that "[t]he unsigned deed left the Firm's offices and thereafter was forged and recorded resulting in [his] damages."

The relevant office policy was not mentioned in an expert witness list that Ned submitted in February 1993. The firm moved the superior court to preclude Ned's experts from testifying about matters that were not addressed in that expert witness statement. In doing so, the firm noted that under the court's pretrial order, the time for amending both pleadings and expert witness disclosures was closed. The superior court granted the firm's motion, thereby precluding Ned's experts from commenting at trial on Offret's deposition testimony about the office policy.

### ii. The trial

Judge Richard D. Savell presided over the jury trial, which was held in June 1998. He instructed the jury on, among other things, superseding causation. At the end of the trial, he instructed the jury to find that the firm was not liable for Ned's damages if it found that a criminal forgery of the quitclaim deed constituted a superseding cause. Ned objected to the giving of the instruction.

The jury found that Taylor failed to "possess and exercise that degree of skill, prudence, and diligence that other attorneys commonly possessed and exercised in 1985 and 1987 under similar circumstances." However, because the jury further found that Taylor's malpractice was not a legal cause of Ned's claimed damages, it did not reach the issues of superseding causation and damages.

After the jury rendered its verdict, the court polled the jury at the request of Ned's attorney. When the court asked the twelve jurors if they agreed with the finding on legal causation, three appeared to say that they did not. However, when the court asked all jurors who agreed with the answer to raise their hands, eleven did so. The court then asked Ned's attorney if he was satisfied that the numbers added up, and he said "yes." The court then excused the jury without objection from Ned's attorney.

## III. STANDARD OF REVIEW

 We review decisions involving the admission of expert testimony for an abuse of discretion.[15] We will find an abuse of discretion only if we are "left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling."[16] We review de novo a jury instruction to which a timely objection was made.[17]

---

11. See id.

12. See id. at 309.

13. Id. at 308 (internal quotation marks omitted) (quoting Restatement (Second) of Agency § 343 (1958)).

14. See id.

15. See Miller v. Phillips, 959 P.2d 1247, 1250 n. 2 (Alaska 1998) (citation omitted).

16. Red Top Mining, Inc. v. Anthony, 983 P.2d 743, 745–46 (Alaska 1999) (internal quotation marks omitted) (quoting Melendrez v. Bode, 941 P.2d 1254, 1256 (Alaska 1997)).

17. See Manes v. Coats, 941 P.2d 120, 125 (Alaska 1997).

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Precluding Ned from Offering Expert Witness Testimony that Was Not Covered in the February 1993 Expert Witness Statement.

■ Ned first argues that the superior court committed reversible error in precluding him from offering expert witness testimony that was not covered in the February 1993 expert witness statement. In particular, he argues that the superior court erred in precluding his expert witnesses from making use of Offret's deposition testimony that it was against the firm's policies to allow unsigned documents to leave the office. We reject Ned's arguments.

In attempting to have his experts make use of the relevant portions of the Offret deposition, Ned sought to expand the factual basis of his claim and introduce a new basis for liability. Ned's first amended complaint asserted three theories under which he claimed that the firm was liable to him: (1) professional malpractice for assisting Joe to use Joe's power of attorney to transfer Ned's property to Joe; (2) breach of a fiduciary duty because of the firm's previous representation of Ned regarding the property in question; and (3) breach of its professional employment contract based on the potential conflict of interest associated with the firm's representation of Joe in matters concerning property for which the firm had previously represented Ned. Ned did not argue that the firm's alleged violation of its own office policies regarding unsigned documents constituted malpractice.

The first mention Ned made of the policy concerning unsigned documents was in his February 1998 cross-motion for summary judgment. He then notified the firm that he sought to make use of the relevant portions of the Offret deposition in a supplemental discovery notice that he served on the firm in March 1998. This notice was served over six years after Ned filed suit, almost a year after we remanded this case,[18] and less than three months before the trial began.

Because Ned sought to introduce a new basis for liability so close to trial, the superior court was within its discretion in precluding Ned's experts from making use of the deposition testimony. Furthermore, when Ned served his notice, the time for amending pleadings and disclosing the opinions of expert witnesses was closed under the pretrial order. Ned did not move for modification of this pretrial order. Accordingly, we hold that the superior court did not err in precluding Ned's experts from making use of Offret's deposition testimony.

### B. The Superior Court Did Not Err in Giving the Jury a Superseding Causation Instruction.

■ Ned argues that the superior court erred in giving the jury a superseding causation instruction over his objections because, "as a matter of law, Joe's alleged forgery was not a super[s]eding/intervening cause of Ned's damages." According to Ned, reasonable minds cannot differ on the point that the firm's negligence was a legal cause of his damages. Ned further asserts that "the jury instruction led to jury confusion and misapplication of the law to the facts." We disagree.

Ned appears to argue that the firm's malpractice led to the deed being forged,[19] which in turn caused Ned's asserted damages. The superior court's superseding causation instruction notified the jury that it should find the firm not liable for Ned's asserted damages if it found that the criminal forgery of the deed was a superseding cause.[20]

---

18. See *Griffith I*, 937 P.2d at 309.

19. The firm states that at trial, "there was no evidence going to the genuineness of the signature on the April 1987 deed." Ned, however, does not argue that the jury was presented with no evidence of forgery. He has therefore waived the argument that the superior court erred in giving the superseding causation instruction because such an instruction was not supported by the evidence. *See State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980) ("Failure to argue a point constitutes an abandonment of it.").

20. The relevant instruction provided:

Even if you find that the defendant was professionally negligent and that his conduct was an actual cause of the plaintiff's injury, you may find that the defendant's conduct was not a legal cause of the injury. A defendant's conduct is not the legal cause of injury where it appears highly extraordinary that the defen-

Superseding cause is a variant of the doctrine of proximate cause. This court has explained that the doctrine of superseding cause will relieve a negligent actor of liability only in exceptional cases.[21] We have stated that "an action of a third person which intervenes to injure the plaintiff will shield a negligent defendant only where after the event and looking back from the harm to the actor's negligent conduct, it appears ... *highly extraordinary* that it should have brought about the harm."[22] We have also noted that "a criminal act will ordinarily break the chain of causation."[23] In doing so, we also reject Ned's argument that reasonable minds cannot differ on whether the firm's malpractice was a legal cause of Ned's damages. There are numerous grounds on which a reasonable jury could reach the conclusion that the jury reached here. For example, one of Ned's own experts testified that even if Joe had contracted with a disinterested attorney to prepare the quitclaim deeds, there is no reason to believe the same result would not have occurred. The expert also stated that if Joe had done so, there is no reason to think that the situation would have turned out any differently. In addition, the jury was read earlier trial testimony in which Ned's mother clearly suggested that she thought that the house was hers and her husband's. One of Ned's experts testified that if Ned's parents thought that the house was theirs, Ned would still have had to take his parents to court in order to remove his parents from the house. The same expert stated that this would have been the case even if the firm had contacted Ned about Joe's 1985 attempt to transfer the property

to himself. These and other points provide ample basis for the jury's conclusion.

In this case, we conclude that questions concerning the extraordinariness of any alleged forgery cannot be decided as a matter of law, and were therefore for the jury to determine. We accordingly hold that the superior court did not err in giving the jury a superseding causation instruction.

### C. The Superior Court Did Not Err in Its Handling of the Jury Poll.

Ned argues that the superior court committed reversible error in its handling of the jury poll. He asserts that the court should have sent out the jury for further deliberation because it appeared that the jury did not agree on a verdict. We hold that Ned has waived his arguments on this issue.

After the jury announced its decision, the superior court polled the jury at the request of Ned's attorney. Three of the jurors appeared to say "no" when the court asked if the verdict just read was their true and correct verdict on the legal causation question.

At least two members of the jury then stated that eleven jurors *had* agreed on the verdict, thereby suggesting that at least two jurors had misunderstood the court's question regarding whether the verdict just read was true and correct. The court accordingly asked all of the members of the jury that agreed with the verdict to raise their hands. The record reflects that eleven jurors did so. When the court asked Ned's attorney if he

dant's negligent conduct should have brought about the harm.

A resulting harm is extraordinary when it would not have occurred without the act of a third person or other force following the defendant's negligence. This intervening force is a "superseding cause" which relieves the defendant from liability. An intervening force that lies within the scope of the foreseeable risk, or has a reasonable connection to it, is not a superseding cause.

Under ordinary circumstances it may be reasonably assumed that another person will not violate the criminal law. The act of a third person in committing a crime is a superseding cause relieving the defendant of liability unless (1) the act or conduct constituting legal malpractice created the situation that afforded an opportunity for a third person to commit a

forgery, (2) the defendant realized or should have realized that he was affording an opportunity for the third person to commit a crime, and (3) that the third person might avail himself of the opportunity to commit a crime.

21. *Williford v. L.J. Carr Invs., Inc.*, 783 P.2d 235, 237 (Alaska 1989) (citing *Dura Corp. v. Harned*, 703 P.2d 396, 403 (Alaska 1985)).

22. *Id.*

23. *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 798 (Alaska 1999) (stating general rule that "a criminal act will ordinarily break the chain of causation," but noting that "this general rule does not excuse the factfinder from examining the foreseeability of the intervening act").

was "satisfied ... that the numbers add up," Ned's attorney replied, "Yes." The court then excused the jury without objection from Ned or his attorney.

■ We have consistently followed the waiver rule,[24] under which litigants waive their "right to challenge the consistency of a jury's verdict if [they fail] to raise the issue and move for resubmission prior to the jury's discharge."[25] In *Grow v. Ruggles*,[26] we explicitly stated that merely polling the jury is not enough to avoid the waiver rule:[27] "To achieve the efficiency the waiver rule is designed to promote, and to avoid the jury shopping it is designed to prevent, counsel must do more than simply poll the jury; he/she must also ask the jury to re-examine its decision."[28]

In this case, Ned does not challenge the consistency of the jury's verdict. Instead, he suggests that the jury did not actually reach consensus, and argues that the superior court should therefore have sent out the jury for further deliberation.

■ We hold that the waiver rule governs the present situation. The policies of promoting efficiency and avoiding jury shopping apply equally well to situations in which a litigant believes that the jury has not actually reached consensus. If a jury poll leads a litigant to believe that consensus has not been reached, he or she must request that the jury be sent out for further deliberation before the jury is excused. Here, Ned's attorney allowed the jury to be excused without objection and even admitted that he was "satisfied ... that the numbers add up." We accordingly hold that Ned has waived his right to argue that the superior court erred in failing to send the jury out for further deliberation.

## V. CONCLUSION

The jury found that the firm's legal malpractice was not the legal cause of Ned's damages. Because the superior court did not err in precluding Ned's experts from making use of deposition testimony and in

instructing the jury on superseding causation, and because Ned waived his argument that the superior court erred in handling the jury poll, we AFFIRM.

24. See *Nelson v. Progressive Corp.*, 976 P.2d 859, 864 (Alaska 1999).

25. *Id.* at 863 (citing *City of Homer v. Land's End Marine*, 459 P.2d 475, 480 (Alaska 1969)).

26. 860 P.2d 1225 (Alaska 1993).

27. See *id.* at 1227.

